AO 91 (Rev. 11/11)  Criminal Complaint

DOA

4/10/2026

## UNITED STATES DISTRICT COURT
### for the District of Arizona

United States of America
v.

Gary Christopher

_____
*Defendant(s)*

)
)
)
)
)
)
)

Case No.  26-6086MJ

## CRIMINAL COMPLAINT

I, the undersigned complainant in this case, being duly sworn, state the following is true and correct to the best of my knowledge and belief:

### COUNT 1

Beginning on an unknown date, but no later than April 8, 2026, in the District of Arizona and elsewhere, defendant Gary Christopher knowingly and intentionally agreed, confederated, and conspired with others, to commit Money Laundering, that is, engaging in a transaction by transporting funds, knowing that the funds transported represented the proceeds of some form of unlawful activity (that is, wire fraud), and knowing that the transportation of the funds was designed in whole or in part to conceal or disguise the nature, the location, the source, the ownership, and the control of the proceeds of the specified unlawful activity (wire fraud), in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(2)(B)(i).

This criminal complaint is based on these facts:

**See attached Statement of Probable Cause, incorporated by reference herein.**

☒ Continued on the attached sheet.

TROY COFE Digitally signed by TROY COFE
Date: 2026.04.10 21:21:16 -07'

Reviewed by AUSA Adriana Genco

Digitally signed by
ADRIANA GENCO
Date: 2026.04.11
09:11:36 -07'00'

_____
*Complainant's signature*

Troy Cofer, Special Agent - FBI
_____
*Printed name and title*

Sworn to before me and subscribed telephonically.

Date: <u>April 11, 2026 @ 9:44am</u>

_____
*Judge's signature*

City and state: <u>Phoenix, Arizona</u>

<u>Honorable Alison S. Bachus, U.S. Magistrate Judge</u>
*Printed name and title*

## STATEMENT OF PROBABLE CAUSE

I, Troy Cofer, Special Agent with the United States Federal Bureau of Investigations ("FBI"), being duly sworn, declare and state as follows:

## INTRODUCTION AND BACKGROUND OF AFFIANT

1.      I am a Special Agent with the Federal Bureau of Investigation ("FBI") duly appointed and acting in that capacity since September 2019. As such, I am authorized to investigate violations of laws of the United States, and I am a law enforcement officer with authority to execute arrest, search, and seizure warrants. I have a bachelor's degree in operations management and a master's degree in finance. Before joining the FBI, I worked as a finance manager at a large global manufacturing company. I was trained at the FBI Academy in Quantico, Virginia, and am currently assigned to the Phoenix Division's Complex Financial Crimes Squad, specializing in wire fraud, mail fraud, bank fraud, money laundering, and other complex financial crimes.

2.      In preparing this Affidavit, I conferred with other law enforcement officials, who share the opinions and conclusions stated herein.  I have personal knowledge of the following facts or have learned them from other law enforcement officers.  I also relied on my training, experience, and background in law enforcement to evaluate this information. Since this Affidavit is being submitted for the limited purpose of establishing probable cause for a complaint, I have not included each and every fact or source of information establishing the violation of federal law.

## PROBABLE CAUSE
## Phantom Hacker Scam Overview

3.      A "phantom hacker scam" ("PHS") is a type of wire fraud scheme wherein an unknown person ("UP"), typically posing as an employee of a technology company or the United States federal government, contacts a victim (often elderly) by phone and falsely claims that the victim's bank account has been hacked or compromised. The purported employee or law enforcement agent informs the victim that the victim must move funds to

a third-party or government account to keep the victim's funds safe from the supposed hackers.

4.    In these schemes, the UP often maintains communications with the victim through interstate and/or international voice calls, text messages, and/or messaging applications for weeks, during which the UP instructs the victim to withdraw all of the money from the victim's bank accounts and send the funds to the UP. The UP often gives express directions to the victim to withdraw specific amounts of money and send the funds via one of several methods, including wire transfers, cashier's checks, cash, or gold.

5.    In cases where victims are instructed to give cash and/or gold, the UP arranges with co-conspirators for a "courier" to meet the victim to collect the victim's assets. Couriers generally have a "handler" who provides the address of the victim and the time of the meeting. Couriers also receive a security code or passcode that they utter to the victim as a form of identification when they arrive to collect the cash or gold. Couriers are compensated for their role in the conspiracy.

6.    By asking the victim to withdraw the funds or gold from a financial institution and transferring the assets by hand to a courier, the conspirators effectively conceal the assets and thus make the proceeds of the fraud more difficult to trace and ultimately recover. In part, this is because cash and gold are not easily traceable and the victim is not told where the courier is taking the victim's assets or where the assets will ultimately be deposited.

7.    Once the courier obtains the assets from the victim, the courier typically delivers the assets to a co-conspirator designated to receive the assets. The handler provides a "token" to the courier to present as a form of identification. The token is usually an item with a printed number—such as a dollar bill with a serial number. From the number on the token, the person receiving the assets can confirm that the courier is part of the conspiracy and accept the delivery.

## PHS Conspiracy Targeting J.H.

8.     In March 2026, the FBI Phoenix Division received a walk-in report from a victim, J.H., who was initially contacted around February 2026 by a UP claiming to be Damian Williams, an employee of a United States Attorney's office. J.H. received an alert on her phone notifying her of a purported $149 charge related to child pornography. J.H. called the number provided in the notification and appeared to be transferred to various subjects posing as bank officials who ultimately referred J.H. to a UP.

9.     UP, who represented himself as "Damian Williams," an employee of a United States Attorney's office, then called and texted J.H. the following days to inform her that she was a victim of identity theft, J.H. was a purported victim in an ongoing federal investigation, and that UP was going to be J.H.'s attorney. UP indicated that J.H.'s financial accounts were compromised and instructed J.H. to turn over her assets to the federal government for "protection."

10.     First, UP convinced J.H. to send $24,358 to UP via wire transfer, which J.H. completed. UP then instructed J.H. to withdraw the balance of her bank account and purchase gold bullion. J.H. complied, purchasing $390,456 in gold bullion. UP also requested that J.H. send photos of the receipt.

11.     Once J.H. sent the photos to UP, UP instructed J.H. to meet a courier who would take the gold bullion. UP also said the courier was going to give J.H. a "security word" for identification. Once UP confirmed the courier provided the right "security code," J.H. handed the gold bullion to the courier. J.H. thought the courier was working with the federal government to protect her assets.

12.     In March 2026, J.H. became aware of the scam and reported it to the FBI. Prior to the report, J.H. had already agreed to another pickup. In preparation, J.H. had liquidated assets in an IRA account, totaling approximately $600,000, and initiated a distribution to a checking account at her bank with the intent of purchasing gold bullion with the assets. With the help of FBI agents, J.H. scheduled another pickup of gold bullion on April 9, 2026. This time, UP agreed to have the courier pick up the gold at J.H.'s

residence. As requested, J.H. sent UP a photo of the package and the gold (which the FBI arranged without actually purchasing the gold bullion).

13. On April 9, 2026, J.H. voluntarily consented to allow FBI agents into J.H.'s residence in preparation for the courier's arrival. UP told J.H. the courier would arrive between 9am and 11am. UP confirmed J.H.'s address, asked for a description of J.H.'s outfit, and told J.H. the security word was "home."

14. At approximately 9:00 a.m., UP called J.H. again, in a call that was consensually monitored by the FBI, and directed J.H. to remain on speaker and go outside the residence with the gold to meet the courier. UP confirmed the vehicle generally described by J.H., which was parked outside J.H.'s residence, was the courier's vehicle.

15. Based upon my training and experience, and knowledge of the facts of this case, I believe the telephone communications UP had with J.H. were interstate wire communications; and the assets J.H. previously transferred at the direction of UP, as well as the gold bullion UP attempted to collect from J.H. on April 9, 2026, constituted proceeds of wire fraud and attempted wire fraud.

16. Pursuant to the anticipatory federal search warrant 26-6068MB issued by the Honorable Alison S. Bachus, United States Magistrate Judge, on April 8, 2026 (the "Search Warrant"), FBI agents contacted the driver of that vehicle and executed the search warrant.

## Manner and Means of the Conspiracy

17. The driver and sole occupant of the vehicle, GARY CHRISTOPHER ("CHRISTOPHER"), is believed to be a United States citizen and Florida resident. CHRISTOPHER served as the courier in the PHS conspiracy, attempting to pick up the $600,000 in gold bullion from J.H. When he was initially contacted, CHRISTOPHER told agents he was at the residence to meet his wife and denied being at residence to meet with J.H. After receiving the Miranda warning from agents, CHRISTOPHER invoked and agents terminated the interview.

18.    CHRISTOPHER was in possession of a Florida driver's license, and boarding passes for air travel from Orlando to Chicago O'Hare, dated April 6, 2026, and from Chicago to Phoenix Sky Harbor International Airport, dated April 9, 2026.

19.    The vehicle CHRISTOPHER was found in was a rental vehicle, which had been rented by CHRISTOPHER on or about April 9, 2026.

20.    At the time of the search, agents reviewed CHRISTOPHER's phone pursuant to the Search Warrant. CHRISTOPHER's phone showed he communicated with his co-conspirators through WhatsApp, a mobile application messaging service, in what appeared to be messages to coordinate their activities and work together to launder funds obtained through the PHS scheme targeting J.H. The communications shared through WhatsApp included J.H.'s name, address, and description of J.H.'s clothing.

21.    Agents also found in CHRISTOPHER's vehicle a handwritten note with a list of steps to complete the pickup. The front of the note stated "me = runner" and "pick up," and it listed the eight following steps CHRISTOPHER apparently intended to follow before, during, and after picking up the package from J.H.:

1.    Send map with GO
2.    Hit GO in car
3.    Send picture of map in car
4.    Send map every 30 minutes
5.    Give person name + password after getting instructions to go from Jolly
6.    Send [photographs] corners of box
7.    Go somewhere - open the package w/ Jolly and count package together
8.    Take pics of front & back and send to Jolly + pic of everything together

22.    Based upon my training and experience and knowledge of the facts of this case, I believe CHRISTOPHER was instructed to travel to a different location to count the assets obtained from J.H., in part, to limit CHRISTOPHER's interaction with J.H. and prevent J.H. from obtaining identifying information about CHRISTOPHER.

23.    The back of the handwritten note was titled "Drop off" and stated, "Receive token from Jolly." The note listed the following 5 steps CHRISTOPHER apparently intended to follow to deliver the package to a co-conspirator.

1. Send pic of location
2. Verify token #
3. Send pic from token to person
4. Have person count amount given
5. Have person sign token with amount received from me and send pic to Jolly

24.    Based upon my training and experience and knowledge of the facts of this case, I believe these are instructions CHRISTOPHER received from a co-conspirator, and which were designed to help conceal from J.H., and law enforcement, the location, ownership, and control of the wire fraud proceeds obtained and attempted to be obtained from J.H.

25.    In furtherance of the above conspiracy, and to accomplish its objects and conceal the existence thereof, CHRISTOPHER, and others performed acts in the District of Arizona and elsewhere, including, but not limited to, the following:

a. UP successfully convinced J.H. to transfer assets in the form of gold bullion to UP, which were proceeds of wire fraud;

b. UP convinced J.H. to engage in a financial transaction by transferring funds from her IRA account to her checking account in preparation for purchasing gold bullion, which was to be collected by CHRISTOPHER;

c. On or about April 9, 2026, CHRISTOPHER traveled from Chicago, Illinois, to Phoenix, Arizona, to pick up assets from J.H.;

d. On or about April 9, 2026, CHRISTOPHER sent a text message to another co-conspirator confirming that he was in route to J.H.'s residence and the co-conspirator responded by providing CHRISTOPHER with a description of J.H. so that CHRISTOPHER could obtain the gold bullion from J.H.; and

e. On or about April 9, 2026, CHRISTOPHER attempted to pick up approximately $600,000 worth of gold bullion, which would have been wire fraud proceeds, from J.H. at J.H.'s residence in Phoenix, Arizona.

26.    Agents released CHRISTOPHER following the execution of the Search Warrant while they reviewed the evidence obtained and consulted with the U.S. Attorney's Office regarding potential charges. The U.S. Attorney's Office authorized agents to arrest CHRISTOPHER on April 9, 2026, and agents successfully encountered CHRISTOPHER at Phoenix Sky Harbor airport on the morning of April 10, 2026, where CHRISTOPHER was waiting to board a flight to Florida. CHRISTOPHER was arrested without incident and made no further statements to law enforcement.

27.    Based on the facts and circumstances stated in this Affidavit, I submit there is probable cause to believe that the CHRISTOPHER knowingly and intentionally agreed, confederated, and conspired with others known and unknown to the grand jury, to commit Money Laundering, in violation of Title 18, United States Code, Sections 1956(h) and 1956(a)(1)(B)(i).

TROY COFE Digitally signed by TROY COFE
Date: 2026.04.10 21:21:56 -07'0

Special Agent Troy Cofer
United States Federal Bureau of Investigations

Sworn to before me and subscribed telephonically on this 11th day of April, 2026.

HONORABLE Alison S. Bachus
United States Magistrate Judge