TIMOTHY COURCHAINE
United States Attorney
District of Arizona
ADRIANA D. GENCO
Arizona State Bar No. 033397
Assistant U.S. Attorneys
Two Renaissance Square
40 N. Central Ave., Suite 1800
Phoenix, Arizona 85004
Telephone: 602-514-7500
Email: Adriana.Genco@usdoj.gov
Attorneys for Plaintiff

UNITED STATES DISTRICT COURT

DISTRICT OF ARIZONA

| United States of America, | No. MJ-26-06086-PHX-ASB |
|---|---|
| Plaintiff, | |
| vs. | **GOVERNMENT'S DETENTION MEMORANDUM** |
| Gary Christopher, | |
| Defendant. | |

The United States of America hereby submits this memorandum in support of its request for pretrial detention of Defendant Gary Christopher. Defendant poses a risk of non-appearance given his lack of ties to Arizona, his ability and willingness to travel within the United States in a moment's notice, and the severe consequences of the current charges. Defendant further poses an economic danger to the community because he is part of a larger conspiracy targeting elderly victims throughout the United States. As such, the Court should find that there are no conditions of release that will reasonably assure both Defendant's appearance at trial and the safety of the community, and order his detention.

## I.    BACKGROUND

Defendant is a courier in a broader fraud scheme in which co-conspirators pose as government officials, targeting elderly individuals to defraud them of their life savings. The co-conspirators each have a role. A courier, like Defendant, picks up the

money from the victim at the direction of a handler (who sends instructions via messages). A third person communicates with the victim, and a fourth person receives the assets from the courier. The criminal organization is purposely compartmentalized to avoid detection and disruption by law enforcement.

Defendant was intercepted by FBI agents on April 9, 2026, as he arrived at the victim's home to pick up $600,000 in gold bullion. Before his arrival, Defendant received a message from his handler, Jolly, to relay that the victim was a 78-year-old wearing blue shorts and a pink top. The message also included the victim's name and address, as well as a pickup time (before 10am). The FBI seized Defendant's phone pursuant to a search warrant authorized by Magistrate Judge Bachus. Defendant denied he was at the residence to meet the victim and instead claimed he was there to meet his wife.

Defendant's phone provides the timeline and the extent of his involvement in the conspiracy. On March 10, 2026, Defendant sent a message to Jolly introducing himself as "Jenny's husband" and announcing that he was ready to work. Three hours later, Jolly sent Defendant an address and asked that Defendant send a map.[1] Defendant asked if he should start driving, but Jolly instructed him to wait. The next day, again, Defendant messaged Jolly, "Good morning . . . Sir . . . I am available for work. Thanks [emoji]." A similar message was sent on March 17th.

On March 18, 2026, Defendant received an address in Edgewater, Florida, from Jolly along with a message listing someone's age, gender, clothing, and a password. Thirty minutes later, Defendant and the contact saved in his phone as "Wifey's Business Number" joined a WhatsApp call for seven minutes. Defendant then sent a picture of a cardboard

---

[1] Generally, the handler will send the courier a zip code. The courier will respond with a map that shows how far the courier is from the zip code. If the distance is acceptable, then the handler will approve the courier's trip and send the full address. The courier then sends a map a different intervals of time until he is arriving at the residence. Before the courier arrives, the handler sends additional details—name, age, clothing, and code word.

box in the car. Approximately 3 hours later, Defendant messaged Jolly, "It's in our safe. Nothing to worry about. I will be waiting for your instructions in the morning . . . Thanks [emoji]." [2] Defendant also sent Jolly a picture of what appears to be the same box from the car inside a safe in a closet.

Another set of messages from March 19th suggest another pickup was scheduled, with Jolly asking if Defendant is "already on the way?"[3]

On March 24, 2026, Defendant asked Jolly to confirm he will have a steady assignment of jobs so he could take leave from work. "I need your ok to ask for a month leave of absence at work. I can work for you full time and cover any route starting Monday. I just need to know that I will have work from you. Thanks [emoji]." When Jolly responded that Defendant would have work, Defendant replied that he would take indefinite leave. "Thanks. I am going to call them and let them know. Indefinite leave of absence. Thanks [emoji]. I appreciate you . . ."

On April 5, 2026, Jolly sent Defendant a link to an itinerary from Orlando to Chicago. Defendant traveled to Chicago the next day. Defendant messaged Jolly to inform him he had arrived at the airport and was getting a rental car. Jolly sent a zip code.

On April 6, Defendant received a 10-minute video from "Wifey's Business Number." The video appears to be a "how to" with a female showing that she is wrapping gold coins in aluminum foil and placing them in two FedEx boxes. At the end of the video, the female states she is going into the FedEx store to drop off the boxes.

That same day Jolly asked Defendant to check flights to Arizona. Defendant quickly booked a flight, but Jolly asked him to cancel the reservation explaining that the job was not confirmed yet. Jolly also reassured Defendant by messaging, "It's a good job" and "It might be confirmed tomorrow." On April 8, 2026, "Wifey" sent Defendant an American

---

[2] Edgewater is approximately 2.5 hours from Defendant's residence in Port Saint Lucie.

[3] The FBI is currently working on identifying other victims.

Airlines reservation confirmation for his Arizona flight on April 9. Wifey also messaged Defendant the following, "Jolly says yours is $5k+."

At approximately 7 am the next day, Defendant messaged Jolly he was at Enterprise picking up a car. The message with the victim's address and information came in from Jolly just before 8 am.

After the FBI seized Defendant's phone, Jolly sent another address in Phoenix (same zip code), instructing Defendant to go there to meet with another victim. Wifey also messaged Defendant the address, reminding him to wait for Jolly's instructions. "You have to wait on Jolly's command before going towards the customer he has to let you know what to do" and "You need the name and password." These messages were coming in around the time Defendant was with the FBI.

While investigating Defendant, FBI agents discovered Defendant withdrew $289,000 from Federal Navy Credit Union checking account on January 7, 2026. The same day, he purchased a BMW for $37,000 using $100 bills.

On April 9, when the FBI contacted Defendant, he had purchased a plane ticket back to Florida leaving Phoenix on Sunday April 12, 2026. The next day, the FBI learned that Defendant changed his plane ticket and was now leaving on April 10th. FBI agents also learned that when Defendant went to Enterprise to rent the car, his wife was with him. But Defendant was traveling alone on April 10th when he was arrested at the airport.

## II.    ARGUMENT

The United States has a substantial interest in ensuring those accused of crimes are available for trials and, ultimately, to serve any sentence imposed. Confinement pending trial is a legitimate means of furthering that interest, *Bell v. Wolfish*, 441 U.S. 520, 534 (1979). A defendant should be detained when the court finds that no condition or combination of conditions will reasonably assure the safety of the community and the appearance of the defendant at future court proceedings. 18 U.S.C. § 3142(e)(1); *United States v. Gebro*, 948 F.2d 1118, 1121 (9th Cir. 1991). Congress passed this law to respond

to "the alarming problem of crimes committed by persons on release." *United States v. Salerno*, 481 U.S. 739, 742 (1987) (citation omitted). At the detention hearing, the United States bears the burden of showing by clear and convincing evidence that a defendant is a danger to any other person or the community and by a preponderance of the evidence that the defendant poses a flight risk. 18 U.S.C. § 3142(f)(2)(B); *Gebro*, 948 F.2d at 1121.

In making a detention determination, the Court must consider (1) the nature and circumstances of the offense; (2) the weight of the evidence; (3) the history and characteristics of a defendant, including family ties, employment, financial resources, community ties, and criminal history; and (4) the nature and seriousness of the danger to the community that would be posed by the person's release. 18 U.S.C. § 3142(g); *United States v. Winsor*, 785 F.2d 755, 757 (9th Cir. 1986).

The § 3142(g) factors here establish that Defendant is a flight risk. He has the ability and the incentive to avoid court proceedings. And he poses an economic danger to others in his role as courier of the criminal organization targeting elderly victims. The Court should therefore order pretrial detention.

### A. Nature and Seriousness of the Charged Offense

The nature and circumstances of the case weigh in favor of detention. The conduct here involves a sophisticated conspiracy that targets elderly victims. The conduct is deliberate, relying on manipulation to induce victims to liquidate assets and transfer life savings to couriers acting at the direction of co-conspirators. Defendant, while not communicating with the victims, knew the victims were elderly. He received messages listing their age and he met with them to pick up the assets.

The crime against vulnerable, elderly victims is increasingly prevalent. In 2025, losses to victims age 60 or older exceeded 7.7 billion dollars.[4] The loss for government

---

[4] The Federal Bureau of Investigations Internet Crime Report, 44 (2025) https://www.ic3.gov/AnnualReport/Reports/2025_IC3Report.pdf

impersonation specific scams increased by almost 50% from 2024.[5] Couriers are indispensable to these operations. Without individuals like Defendant, willing to travel, retrieve and transport assets, these schemes cannot function.

The nature of the offense in this case is also closely related to the risk of flight. Defendant traveled from state to state picking up gold from victims of the conspiracy. Defendant was paid per pickup. The more pickups he completed, the more money he would receive. Defendant's handler would confirm when Defendant could check in to the hotel, suggesting lodging was covered by the criminal organization. The messages from Defendant's phone also prove his ability and willingness to mobilize on short notice. All these factors show Defendant can easily flee to another state, avoiding law enforcement as he continues to engage in the conspiracy.

In addition to the resources, Defendant has the disposition to avoid detection from law enforcement. After he was contacted by the FBI, Defendant changed his flight, leaving Arizona sooner than he originally planned. Flight risk assessment does not require international travel. The Bail Reform Act requires this Court to assess whether any condition will reasonably assure Defendant's appearance, not whether he will flee the country. 18 U.S.C. 3142(e). Defendant's nonappearance harms the judicial process regardless of how far he travels. The nature and seriousness of the charged offense weigh in favor of detention.

### B. Weight of the Evidence

Although the weight of the evidence is generally considered the least important factor, *United States v. Motamedi*, 767 F.2d 1403, 1408 (9th Cir. 1985), it nevertheless weighs in favor of pretrial detention. The evidence here includes communications with co-conspirators found in Defendant's phone with the victim's address and information. The 10-minute video showing Defendant how to package the gold coins for shipping, as well

---

[5] *Id*. at 48

as the photo of one of the packages in his safe, shows Defendant knew he was picking up gold at the different locations. The uncommon nature of the instructions, like getting a passcode, the expected payment of $5,000 to pick up a box, and his denial that he went to the victim's residence to meet the victim point to Defendant's knowledge of the illegality of his conduct. The weight of the evidence is substantial and demonstrates the clear economic danger Defendant poses to others if he is not detained. When combined with a potential lengthy prison term, it creates a serious risk of flight to avoid prosecution in Arizona.

### C. Defendant's History and Characteristics

Defendant's criminal history, while dated, shows a past willingness to engage in crimes of dishonesty.[6] It shows Defendant's current offense is neither out of character, nor his first time dealing with the criminal justice system.

Defendant has no meaningful ties to Arizona. He flew in the morning of April 9, just hours before he was supposed to pick up the gold from the victim. He was arrested by FBI agents while waiting to board a flight leaving Arizona the next day. Defendant's stability in the community outside of Arizona is also uncertain. Defendant reported he was employed for over 25 years, however, in March 2026, he took an indefinite leave of absence to live a life of crime. Defendant's criminal actions were not an isolated event. He sought confirmation that he would be given a steady stream of courier assignments and within days he traveled to Chicago. There, he was on standby for pickups within the city. He was willing to uproot his life to travel on demand to make quick cash.

Defendant's access to financial resources is also a concern directly related to the risk of nonappearance. In addition to having access to a network of people operating across the United States, Defendant withdrew $289,000 in cash from his Federal Navy Credit Union account earlier this year. He paid $37,000 for a car in January, and he listed a balance

---

[6] Pretrial Services Report ("PTSR") (Doc. 6 at 4-5.)

of $700 in his personal checking account. (PTSR at 3.) There is an outstanding balance of $250,000 that Defendant can use to abscond.

All these facts considered together—Defendant's criminal history, lack of Arizona ties, unconfirmed current employment, his wife's involvement in the conspiracy, and financial resources—show Defendant is a flight risk.

### D.  The Nature and Seriousness of the Danger to the Community

Danger to the community encompasses pecuniary or economic harm. *United States v. Reynolds*, 956 F.2d 192, 192-93 (9th Cir. 1992). That is a significant concern in this case. Elder fraud is a widespread and devastating threat. These crimes strip victims of retirement savings, home equity, and funds necessary for basic living expenses. The crime is not merely financial, it is also a psychological assault on the victims. Many feel extreme shame for having fallen victim to the scam and many lose their financial independence as a result.

As outlined above, this was not an isolated incident. Defendant left his job in order to travel the country retrieving and transporting criminal proceeds. The stability Defendant may have had at some point no longer exists. His wife appears to be just as involved in the conspiracy as he is—sending addresses of victims, making travel arrangements, and sending instructions on how to ship the gold. That means there is an ongoing risk that he will reengage with co-conspirators and continue participating in the conspiracy, posing a great risk to the community.

/ /

/ /

/ /

- 8 -

### III.    <u>CONCLUSION</u>

For the foregoing reasons, the United States respectfully requests that this Court order the detention of Defendant pending trial.

Respectfully submitted this 14th day of April, 2026.

TIMOTHY COURCHAINE
United States Attorney
District of Arizona

*s/ Adriana Genco*
ADRIANA D. GENCO
Assistant U.S. Attorney

### <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this date I electronically transmitted the attached document to the Clerk's Office using the CM/ECF system for filing.  I hereby certify that on this same date, I served the attached document by electronic mail, on the following, who may or may not be registered participants of the CM/ECF System: Keith Terry.

*s/Adriana Genco*
U.S. Attorney's Office